UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| UNITED STATES OF AMERICA | ) |                              |
|--------------------------|---|------------------------------|
|                          | ) |                              |
| v.                       | ) | Docket no. 2:19-cr-00017-GZS |
|                          | ) |                              |
| CHARLES O'CONNELL,       | ) |                              |
|                          | ) |                              |
| Defendant.               | ) |                              |

**ORDER ON MOTION TO SUPPRESS**

Before the Court is Defendant Charles O'Connell's Motion to Suppress (ECF No. 28). The Court held an evidentiary hearing on this Motion on May 16, 2019. Having considered the evidence presented at the hearing, as well as the arguments advanced by counsel, the Court DENIES the Motion for the reasons explained below.

**I.     FACTUAL FINDINGS**

On November 1, 2018, Maine State Trooper Jason Wing worked a drug interdiction detail on I-95 in conjunction with the Maine Drug Enforcement Agency ("MDEA"). That day, shortly after 4 P.M., MDEA Agent Scott Corey contacted Wing by radio regarding a special interest vehicle. Agent Corey told Wing that he had seen a vehicle that he recognized "as having prior contacts with drug trafficking" coming through the Hampton tolls. Corey gave Wing the vehicle's plate number and said it was registered to Kevin Fecteau. Wing eventually located the vehicle, a Chevrolet truck, based on its license plate and began to follow it northbound.

Wing trailed the truck and observed its operation in the middle lane amidst moderate to heavy traffic. Over a couple miles, Wing saw the truck cross the lane dividers at least once and

jerk from side-to-side within the lane multiple times, including once where the truck moved from the right lane dividers all the way to the left side of the lane. Based on his training and experience, Wing considered these movements indicative of impaired or distracted driving. Wing also noted that the truck remained in the middle lane without actively passing other cars as required by Maine law. Believing he had seen two traffic violations—impaired or distracted driving and a middle lane violation—Trooper Wing decided to stop the truck. Before doing so, he requested backup from Trooper Adam Schmidt whom he knew had a drug detection dog. Wing routinely calls for assistance when stopping special interest vehicles. Such stops can be dangerous and, as a result, Schmidt understood Wing's request to be related to both safety and a potential drug sniff.

After contacting Schmidt, Wing merged into the middle lane behind the truck and initiated a traffic stop. Wing approached the vehicle and began to speak with the driver. In attempting to ascertain whether the driver was impaired, Wing asked the driver where he was coming from and going to and scrutinized his body movements. The driver said he was coming from Seabrook, New Hampshire, and returning to Biddeford, Maine. Wing observed that the driver was breathing heavily and evading his gaze to an abnormal degree, which he considered signs of illegal activity. The driver denied being impaired but admitted that he had been distracted by trying to make a phone call. During this exchange, Wing noted that the driver's phone rang repeatedly. Wing also requested and received license and registration. These documents identified the driver as Defendant Charles O'Connell and confirmed MDEA's report that Kevin Fecteau owned the truck. The third-party registration enhanced Wing's suspicion of a criminal drug enterprise because, in his experience, drug traffickers often utilize third-party vehicles.

Eventually, Wing asked O'Connell to exit the truck so he could continue to evaluate whether O'Connell was impaired. Though O'Connell complied and exhibited no signs of

impairment, he had already admitted to being distracted and the middle lane violation remained unsettled. Wing then conducted a pat-down for weapons, talked with O'Connell briefly, and returned to his cruiser to run records checks. As he performed those checks, Wing called Agent Corey, asked if he was familiar with O'Connell, and requested that he research a "no access allowed" report disclosed by one of the checks. Corey stated that he would review the report and Wing exited his cruiser to speak with Trooper Schmidt who had just arrived.

Wing relayed what he had learned to Schmidt for about forty seconds and then they separated. Wing returned to his cruiser and continued his records checks—including probation and bail—and Schmidt approached O'Connell, who had remained outside the truck, to ensure officer safety.[1] During Wing and Schmidt's conversation, Agent Corey had been attempting to contact Wing over the radio. Approximately twenty seconds after Wing re-entered his cruiser, Corey reached out again and told Wing that the "no access allowed" report was a drug intel report from March 2018 stating that O'Connell was dealing heroin out of his apartment. Upon hearing this, Wing exited his cruiser, waited a moment for Schmidt to step away from O'Connell, and the two conferred about whether O'Connell's stated travel itinerary was consistent with his sighting at the Hampton tolls. The Troopers then re-engaged O'Connell to clarify where he was coming from.[2] By the end of that inquiry, just over nine minutes had passed since the initial stop.

Following the travel questions, Schmidt mentioned that he had a drug detection dog. O'Connell's eyes began to water in response, which Schmidt interpreted as a sign that O'Connell

---

[1] Trooper Wing testified on cross examination that, at the time of his initial conversation with Schmidt, he was no longer investigating an impaired or distracted driver situation and had transitioned to a drug investigation. This does not contradict Wing's earlier testimony, which the Court credits, that he continued running computer checks on O'Connell when he re-entered his cruiser.

[2] The record does not suggest, nor does the Government contend in its Opposition, that O'Connell's answers on this point were inconsistent or deceptive.

was engaged in criminal activity that he wanted to conceal.[3] Schmidt informed O'Connell that he would be conducting a drug sniff and asked if there were drugs in the truck. O'Connell replied in the negative. Schmidt asked O'Connell how his "habit" had been, and O'Connell responded that it had been "fine." This added to Schmidt's suspicions of drug-related activity because, in his experience, non-drug users usually deny any kind of habit. With Wing and O'Connell standing off to the side, Schmidt conducted the sniff. About fourteen minutes into the stop, the dog alerted to the presence of narcotics in the truck. An ensuing vehicle search revealed a cellophane wrapper with off-white residue that Schmidt believed to be drugs. Wing then searched O'Connell and, after asking him to remove his boots, found a plastic bag of powder later confirmed to be fentanyl. Eventually, Wing arrested O'Connell and transported him to the station.

## II. DISCUSSION

Defendant seeks suppression of all seized evidence based on two alleged violations of his Fourth Amendment rights: (1) Wing lacked reasonable suspicion to pull him over; and (2) the officers unreasonably prolonged the stop. The Court addresses these arguments in turn.

### A. Initiation of the Stop

Defendant's first argument is easily dispatched as Wing had enough evidence to initiate the traffic stop. "A traffic stop constitutes a seizure of 'everyone in the vehicle' for purposes of the Fourth Amendment and thus must be supported by reasonable suspicion that a traffic violation has occurred." United States v. Chaney, 584 F.3d 20, 24 (1st Cir. 2009). Reasonable suspicion exists where, based on the totality of the circumstances, an officer has "a particularized and objective basis for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002) (internal citations and quotations omitted). Here, over the course of just a few miles and in

---

[3] Schmidt testified that, based on his training and experience, suspects who are nervous and trying to conceal criminal activity often exhibit involuntary physiological responses such as eye watering during police questioning.

4

moderate traffic, Wing observed Defendant's truck crossing the lane dividers, jerking back and forth in the lane, and, at least once, swerving all the way across the lane. These observations provided him with a "particularized and objective basis" to believe that Defendant was driving while impaired.[4] Arvizu, 534 U.S. at 277; see State v. Porter, 960 A.2d 321, 323-324 (Me. 2008) (finding reasonable suspicion of impaired driving under Maine law where, over a quarter mile, officer saw the defendant's vehicle cross center line, move across the lane to touch the fog line, and then move back and touch the center line). Thus, the Court declines to suppress any evidence on the ground that the stop was unlawful at its inception.

### B. Scope of the Stop

Defendant also seeks suppression by arguing that the officers exceeded the permissible scope of the stop before discovering any contraband. More specifically, he asserts that prior to the drug sniff, the officers took steps to investigate drug crimes without reasonable suspicion and thus "prolong[ed]" the stop in violation of his Fourth Amendment rights. Rodriguez v. United States, 135 S. Ct. 1609, 1615 (2015). Although this is a closer question, the Court disagrees.

Pursuant to the Fourth Amendment, any police action during a traffic stop "must be reasonably related in scope to the stop itself 'unless the police have a basis for expanding their investigation.'" United States v. Ruidiaz, 529 F.3d 25, 29 (1st Cir. 2008) (quoting United States v. Henderson, 463 F.3d 27, 45 (1st Cir. 2006)). The reasonableness inquiry is an objective one that "requires a practical, commonsense" approach and "entails a measurable degree of deference to the perceptions of experienced law enforcement officers." Id. A traffic stop is not a "snapshot

---

[4] Defendant contends that Wing lacked reasonable suspicion of impaired driving. He analogizes this case to the Law Court's decision in State v. Caron, which held that "[a] vehicle's brief, one time straddling of the center line of an undivided highway is a common occurrence and, in the absence of oncoming or passing traffic, without erratic operation or other unusual circumstances, does not justify an intrusive stop by a police officer." 534 A.2d 978, 979 (Me. 1987). Here, however, Defendant was surrounded by traffic and Wing observed much more evidence of erratic operation than a single straddling of a lane marker. Caron is, therefore, distinguishable on the facts and does not alter the Court's conclusion that Wing had reasonable suspicion of impaired driving in this case.

5

of events frozen in time and place, but rather more closely resembles an ongoing process." United States v. Dion, 859 F.3d 114, 124 (1st Cir. 2017) (internal citations and quotations omitted). An officer may respond to the "emerging tableau" of the stop and "increase the scope of his investigation by degrees if his suspicions mount." United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001). In other words, reasonable suspicion can arise "not just from the combination of facts, but from their *progression*." United States v. Wright, 582 F.3d 199, 213 (1st Cir. 2009).

"A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." Illinois v. Caballes, 543 U.S. 405, 407 (2005). During such a detention, officers may "address the traffic violation that warranted the stop, . . . attend to related safety concerns," and engage in the "ordinary inquiries incident" to the stop. Rodriguez, 135 S. Ct. at 1614-1615 (internal citations and quotations omitted). "Traffic stops are especially fraught with danger to police officers, so an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely." Id. at 1616 (internal citations and quotations omitted). Thus, the police may order a driver out of a vehicle and run criminal records checks without disrupting their mission. Rodriguez, 135 S. Ct. at 1615-1616; Dion, 859 F.3d at 124. Officers may also "conduct certain unrelated checks during an otherwise lawful traffic stop" but "may not do so in a way that prolongs the stop" absent independent reasonable suspicion. Rodriguez, 135 S. Ct. at 1615.

Based on this precedent, the Court must determine whether the officers' actions ever departed from their mission in a way that prolonged the stop and, if so, whether they had reasonable suspicion to take those actions. Id. at 1615-1616. The stop's original mission was to: (1) determine whether Defendant was impaired or distracted; and (2) assess whether the circumstances warranted a ticket for a middle lane violation. Here, to the extent that the officers took actions exceeding the

6

scope of this mission, the Court concludes that any such actions either did not prolong the stop or were justified by independent reasonable suspicion.

The Court proceeds chronologically through the events of the stop. At the outset, Wing was entitled to approach the truck and ask Defendant about his travels because those acts related to his goal of investigating impairment. See Dion, 859 F.3d at 125 (noting that First Circuit "case law allows an officer carrying out a routine traffic stop to request identification . . . and to inquire into the driver's itinerary"). The ensuing exit order and records checks also coincided with Wing's mission. Wing's exit order was justified as means of "addressing" impairment, Rodriguez, 135 S. Ct. at 1614, and both the exit order and records checks—including Wing's request that Corey research the "no access allowed" report—helped to "ensure officer safety."[5] Dion, 859 F.3d at 124. To the extent that Wing's more general inquiry about Defendant during the call with Corey could be considered a departure from the stop's mission, that call occurred simultaneous to Wing's ongoing records checks and, therefore, did not "measurably extend" the stop. Rodriguez, 135 S. Ct. at 1615 (quoting Arizona v. Johnson, 555 U.S. 323, 333 (2009)).

Wing's exit from his cruiser and forty second conversation with Schmidt upon Schmidt's arrival was another "objectively" reasonable safety measure. United States v. Burwell, 763 F. App'x 840, 851 (11th Cir. 2019). At that point in the stop, Wing was aware that the MDEA had connected Defendant's vehicle to drug trafficking and he had observed signs that Defendant was abnormally nervous. Wing's quick briefing of Officer Schmidt fell within the safety portion of his mission under these circumstances.[6] See id. (holding that officer's call for backup, briefing of

---

[5] Once one of Wing's checks uncovered the "no access allowed" report, it was reasonable for Wing to inquire as to that report's substance based on officer safety. The "emerging tableau" of the stop generated safety concerns given the truck's connection to drug trafficking and Defendant's nervousness. Chhien, 266 F.3d at 6; see United States v. Arnott, 758 F.3d 40, 45 (1st Cir. 2014) ("The connection between drugs and violence is, of course, legendary").

[6] The Court acknowledges that Wing testified that he did not discuss impairment with Schmidt and relayed facts based on his belief that the officers had transitioned to a drug investigation. However, an officer's subjective intent

7

other officer, exit order, and pat down of defendant were all related to his mission to ensure officer safety). Likewise, Wing's resumption of his records checks and receipt of information about the drug intel report were constitutionally permissible as components of his "ordinary" and safety-related inquiries. Rodriguez, 135 S. Ct. at 1615.

By the time Wing heard about the drug intel report in his cruiser, his suspicions of drug-related criminal activity had "understandably escalated" due to several factors. Chhien, 266 F.3d at 8. First, prior to the stop, an officer from MDEA provided Wing with detailed information about Defendant's vehicle and told Wing that he recognized the vehicle as connected to drug trafficking activity. Given that this tip came from a known source and that Wing quickly corroborated much of it—by locating the truck based on the license plate provided, confirming the truck's direction of travel, and substantiating the truck's registration—it was reasonable for him to rely on it.[7] See United States v. Jones, 700 F.3d 615, 621 (1st Cir. 2012) (internal citations and quotations omitted) ("Information provided to police by third parties may create reasonable suspicion if the information contains sufficient indicia of reliability"); United States v. Sandoval-

---

has no bearing on the reasonableness analysis. See Ruidiaz, 529 F.3d at 29 ("[r]easonableness in this context is a construct that must be judged according to objective criteria; it is not dependent on an individual officer's subjective motives"). Viewing the totality of the circumstances through a "real-world" lens, it was reasonable for Wing to spend forty seconds telling Schmidt what he had learned about Defendant and his travels as a matter of officer safety. Id.

[7] Courts routinely find that tips provided by one law enforcement officer or agency to another are reliable. See, e.g., United States v. Benoit, 730 F.3d 280, 285 (3d Cir. 2013) (holding that Coast Guard officers reasonably relied on tip from foreign law enforcement agency where that agency was known to officers and repeat player in drug trafficking prevention); United States v. Winters, 491 F.3d 918, 922 (8th Cir. 2007) (concluding that "significantly corroborated" tip from law enforcement officer to state narcotics agents was sufficiently reliable and including it in reasonable suspicion calculus); United States v. Perez, 440 F.3d 363, 371 (6th Cir. 2006) (incorporating tip from one DEA office to another in group of "factors to be aggregated" in making reasonable suspicion determination); United States v. Troka, 987 F.2d 472, 474 (7th Cir. 1993) (finding reasonable suspicion based in part on tip from sister police department since that "police department was a reliable source and because later information provided further corroboration for the tip"). Although the First Circuit does not appear to have used the traditional tip framework to analyze the reliability of information passed between law enforcement officers, the Court discerns no precedent indicating that courts cannot do so. See United States v. Dominguez, No. CR 118-021, 2018 WL 4762897, at *5 (S.D. Ga. Sept. 14, 2018) (rec. dec., aff'd Oct. 2, 2018) (noting that exhaustive nationwide search revealed no support for the premise that the tip framework and collective knowledge doctrine are "mutually exclusive").

Espana, 459 F. Supp. 2d 121, 131 (D.R.I. 2006) (explaining that courts assess reliability based on a "sliding scale" with less corroboration required for known sources than anonymous ones).

Second, Wing observed Defendant acting in a manner that he considered to be abnormally nervous for a traffic stop. Providing a "measurable degree of deference to the perceptions" of an experienced law enforcement officer, this could be considered indicative of criminal activity. Ruidiaz, 529 F.3d at 29; see Dion, 859 F.3d at 126 (indicating that a suspect's nervousness is a factor that "can (and should) be thrown into the reasonable-suspicion mix"). Third, the vehicle's third-party registration provided more fuel for the officers' suspicions that Defendant was engaged in illegal drug trafficking. See United States v. Ramdihall, 859 F.3d 80, 92-93 (1st Cir. 2017) (affirming reasonable suspicion finding based in part on officer's testimony that drug traffickers often use vehicles rented by others to transport drugs). Although this fact may have appeared innocuous by itself, the unfolding events and Wing's experience combined to undermine more innocent explanations.[8] See Ruidiaz, 529 F.3d at 30 ("a fact that is innocuous in itself may in combination with other innocuous facts take on added significance"); United States v. Hornbecker, 316 F.3d 40, 47 (1st Cir. 2003) ("factual circumstances that seem innocuous to a layman might well appear suspicious (and reasonably so) to the seasoned eye of" police officers).

Viewed in their totality, these facts provided the officers with a "particularized and objective basis" to marginally expand their investigation and ask Defendant a few questions about drugs. Arvizu, 534 U.S. at 277. The "circumstances" and "degree of intrusiveness" matter when

---

[8] It is unclear to the Court whether the drug intel report carried sufficient indicia of reliability for the officers to rely on it. On one hand, there is no evidence in the record indicating the basis of the report's information, but, on the other, Defendant's nervousness and presence in a third-party's truck connected to drug trafficking seem to bolster the report's credibility. See United States v. Goguen, No. 1:16-cr-00167-JAW, 2017 WL 1828862, at *3 (D. Me. May 5, 2017) (rec. dec., aff'd June 19, 2017) (finding tip reliable in part because it was "consistent with facts" known to officer before receiving the tip). However, even assuming the report was insufficiently corroborated to be included in the reasonable suspicion calculus, the Court concludes, as explained *supra*, that the other facts known to the officers warranted their actions up to and including the drug sniff.

9

analyzing reasonableness. Chhien, 266 F.3d at 8. Here, when Wing exited his cruiser after learning about the drug intel report, the information known to the officers had, at the very least, "elevated [their] suspicions" about drugs "to a degree sufficient to continue the detention briefly and in a minimally intrusive way." Id. at 10. With this in mind, Schmidt's decision to tell Defendant about his dog was appropriate. See Chhien, 266 F.3d at 9-10 (approving brief additional questioning carried out following discovery of large sum of cash); United States v. Sowers, 136 F.3d 24, 27 (1st Cir. 1998) (holding that increasingly intrusive investigatory techniques unrelated to original purpose of stop were permissible based on "mounting suspicions"). Moreover, when Defendant exhibited extreme nervousness in response, the facts and their "*progression*" warranted a few drug-related questions and a drug sniff of the truck. Wright, 582 F.3d at 213.

In summation, all the officers' actions preceding the drug sniff either fell within their constitutional authority or did not "measurably extend" the stop. Rodriguez, 135 S. Ct. at 1615 (quoting Johnson, 555 U.S. at 333). These actions also uncovered facts sufficient to justify the sniff itself. Wright, 582 F.3d at 213. Thus, the Court declines to suppress the evidence based on events prior to the completion of the sniff. As Defendant does not question the lawfulness of anything that occurred after the sniff, the Court's task is complete.[9]

### III. CONCLUSION

In light of the foregoing, Defendant's Motion to Suppress (ECF No. 28) is DENIED.

SO ORDERED.

       /s/ George Z. Singal
       United States District Judge

Dated this 6th day of June, 2019.

---

[9] Defendant does not contest the legality of the officers' post-sniff actions in his Motion and he did not contest them at the evidentiary hearing. As a result, any arguments Defendant could have made regarding those actions have been waived. See United States v. Ramos, 961 F.2d 1003, 1005 (1st Cir. 1992) ("[a] defendant is normally deemed to waive arguments that he does not present to the district court").